[Cite as *State v. Sexton*, 2025-Ohio-718.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240274 |
| | | TRIAL NO. B-2202985 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| JOHNATHAN SEXTON, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: March 5, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Ravert J. Clark*, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

**{¶1}** Defendant-appellant Johnathan Sexton appeals his convictions on two counts of felonious assault following a jury trial. Sexton argues that the weight of the evidence presented at trial established that he acted in self-defense when he wielded a landscaping machete against his neighbor. Sexton alternatively avers that the trial court erred in failing to merge the two counts for purposes of sentencing as allied offenses of similar import. For the reasons that follow, we affirm the trial court's judgment in part, reverse it in part, and remand the cause to the trial court.

### *Factual History*

**{¶2}** The incident underlying the charges occurred in Colerain Township in the late afternoon hours of June 22, 2022. Sexton and his girlfriend had moved into a house on Poole Road about two to three months prior. The couple lived two doors down from their neighbor. Sexton and the neighbor did not know one another and had never met prior to the incident.

**{¶3}** The neighbor had recently rescued a white, six-month-old pit bull named Hank. When the dog escaped from the neighbor's backyard around 5:00 p.m. on the day in question, the neighbor gave chase. Surveillance video from two nearby properties showed the neighbor pursuing the dog, albeit slowly. The neighbor explained at trial that his left-side mobility had been somewhat hampered by a stroke he suffered nearly two years earlier.

**{¶4}** What happened next was the subject of dispute at trial.

### *A. The Neighbor's Version of Events*

**{¶5}** After finally getting ahold of Hank, the neighbor held the dog by the collar and crossed through Sexton's front yard on his way back home. Sexton came out of the house and asked what the neighbor was doing on the property. The neighbor

explained that he was retrieving his dog. At that point, Hank got "spooked" by Sexton and ran off again, jumping into the open driver's side door of Sexton's Ford F-150 in the driveway.

**{¶6}** The neighbor verbally attempted to coax Hank out of the truck. According to the neighbor, Sexton came up behind him and reached into the truck, grabbing Hank by the collar. Sexton ended up pulling the collar off while unsuccessfully trying to remove the dog. One of the photographic exhibits at trial depicted a dog collar on the ground immediately beneath the open driver's side door of the truck.

**{¶7}** The neighbor testified that Sexton made a comment about retrieving his gun and shooting the dog. The neighbor told him to go ahead. According to the neighbor, Sexton retorted, "[M]aybe I will get something for you," and the neighbor replied, "[D]o what you got to do." Sexton went into his house while the neighbor continued trying to coax the dog out of the truck.

**{¶8}** The neighbor maintained he was standing in the driveway when Sexton approached from behind and said he "had something for" the neighbor. According to the neighbor, Sexton struck him on the back of the neck twice with a heavy item and once on the arm near his right wrist. That item turned out to be a landscaping machete. The neighbor fell to the ground. He was bloodied but remained conscious.

**{¶9}** The police arrived a short time later. The neighbor was transported by ambulance to a hospital for medical attention. He suffered deep gashes on his neck and arm, a fractured spine, and a broken wrist. Treatment included 64 stitches to the back of his neck and two surgeries on his arm.

### B. Sexton's Version of Events

**{¶10}** Sexton offered a very different narrative. Earlier on the day in question,

he and his girlfriend did some landscaping work for a different person in the neighborhood. They arrived home around 4:00 p.m. in the midst of a heavy downpour. Sexton parked his truck in the driveway and left his phone and wallet on top of the closed center console to keep them from getting wet. He maintained that he closed the driver's side door of the truck before sprinting for the house.

{¶11} Sexton showered, dressed, and laid down on the couch for about an hour while the thunderstorm continued. When the rain began to subside, he decided to go to his father's house to print off some tickets. According to Sexton, he walked out the front door and noticed the dome light inside the truck was illuminated and the driver's side door was open. That was when he saw a man he did not know (the neighbor) standing in the open doorway of the truck. Sexton maintained there was no dog in sight.

{¶12} Sexton confronted the neighbor and demanded to know what he was doing. The neighbor replied something like "what are you going to do about it?" Sexton could see that the lid to the center console was standing open. He remembered he had left it closed with his wallet and cell phone on top. Photographs admitted at trial showed Sexton's wallet laying on the driver's seat and his cell phone laying on the rocker board in the open driver's side doorway.

{¶13} According to Sexton, the neighbor reached into the truck and picked up a pouch Sexton stored in the center console. The pouch held a flashlight and pliers and bore a pocketknife clipped to the outside. Sexton testified he believed the neighbor was about to get physical and he feared being cut or stabbed. In response, Sexton retrieved a machete sitting atop a nearby box and walked back over to the truck. He told the neighbor to leave, but the neighbor refused. According to Sexton, the neighbor said something like "go ahead and try." The neighbor held the pouch in his

4

right hand and made to remove the knife with his left hand as he stepped forward.

**{¶14}** Sexton testified that he told the neighbor to stop and, when the neighbor refused, he struck the man with the machete. The blow landed near the neighbor's right wrist, disarming him of the pouch. The neighbor then lunged at or fell toward Sexton. Sexton stumbled backward and began losing his footing in the wet grass. He struck the neighbor a second time on the back to halt the man's progress. Sexton maintained he was still in fear for his life and totally unaware of the neighbor's left-side weakness from the stroke for the duration of their encounter.

**{¶15}** The neighbor fell to the ground. Sexton testified that the dog approached for the first time after the confrontation was over and bit or scratched him on the arm. He shoved the dog away. Sexton then picked up the pouch to which the closed pocketknife remained clipped and tossed it toward the truck cab. His purpose in doing so was to remove the weapon from the neighbor's reach. Sexton then ran inside and told his girlfriend to call 9-1-1. He went back outside to keep an eye on the neighbor until the police arrived. Sexton cooperated with the police both on scene and at the police station.

### *Procedural History*

**{¶16}** Sexton was indicted on two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), both felonies of the second degree. The jury rendered guilty verdicts on both counts. Sexton was sentenced to an indefinite prison term of three to four and a half years on the first count and a concurrent three-year term on the second count. He now appeals.

### *Analysis*

**{¶17}** Sexton raises two assignments of error on appeal. The first assignment contests the weight of the evidence supporting his convictions. The second assignment

5

challenges the trial court's failure to merge the two felonious assault offenses for purposes of sentencing.

### A. Self-Defense

**{¶18}** Sexton maintains the manifest weight of the evidence established that he acted in self-defense, thereby negating his criminal liability for felonious assault.

**{¶19}** The offense of felonious assault is proscribed by R.C. 2903.11. The statute provides in pertinent part that no person shall knowingly cause serious physical harm to another or cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(1) and (2). At trial, Sexton admitted that he knowingly inflicted serious physical harm upon the neighbor by use of a deadly weapon, i.e., a machete. He does not dispute as much on appeal. Rather, Sexton maintains that the manifest weight of the evidence supports that he acted in self-defense.

### 1. Standard of Review

**{¶20}** For self-defense claims, reviewing courts conduct a manifest weight analysis to determine whether the State met its burden of persuasion. *State v. Messenger*, 2022-Ohio-4562, ¶ 26. Distinct from sufficiency review, a manifest weight inquiry requires us to assess whether the trier of fact created a manifest miscarriage of justice in resolving conflicts in the evidence. *State v. Yeban*, 2024-Ohio-2545, ¶ 57 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997).

**{¶21}** We afford substantial deference to the credibility determinations of the trier of fact because the trier directly observes the witnesses during the proceedings. *See State v. Glover*, 2019-Ohio-5211, ¶ 30 (1st Dist.), quoting *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20. Accordingly, reversal on manifest weight grounds is warranted "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

### 2. The Law on Self-Defense in a Deadly Force Case

**{¶22}** The elements of a self-defense claim in a deadly force case are (1) the defendant was not at fault in creating the situation giving rise to the affray, (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape was in the use of similar force, and (3) the defendant did not violate any duty to retreat. *Messenger* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002).

**{¶23}** Under Ohio's current burden-shifting scheme, the defendant must first produce evidence that tends to support that he acted in self-defense. R.C. 2901.05(B)(1). Once the defendant satisfies this initial burden, the burden shifts to the State to disprove at least one of the elements of self-defense beyond a reasonable doubt. *Id.*; *see State v. Smith*, 2020-Ohio-4976, ¶ 49 (1st Dist.). The trial court provided the jury with a self-defense instruction, meaning the court concluded that Sexton presented adequate evidence to carry his initial burden of production. *See State v. Mitchell*, 2023-Ohio-2604, ¶ 12 (1st Dist.), citing *Messenger*, 2022-Ohio-4562, at ¶ 26. We therefore scrutinize whether the weight of the evidence supports that the State met its reciprocal burden to disprove at least one of the elements beyond a reasonable doubt.

### 3. Analysis of the Elements of Sexton's Self-Defense Claim

**{¶24}** For ease of analysis, the elements will be addressed slightly out of order.

#### a. Duty to retreat

**{¶25}** To reiterate, the third prong of a successful self-defense claim involving deadly force mandates that the defendant did not violate any duty to retreat or otherwise avoid the danger. *See Messenger*, 2022-Ohio-4562, at ¶ 14. Ohio's recent "stand your ground" law dispenses with this requirement where the defendant was in

a place he lawfully had a right to be. *See Mitchell* at ¶ 17, citing R.C. 2901.09(B). Because Sexton lawfully had a right to be on his own property, he had no duty to retreat under Ohio law.

### b. *Not at fault*

**{¶26}** The first prong of any successful self-defense claim requires that the defendant was not at fault in creating the situation giving rise to the disturbance. *See Messenger* at ¶ 14. "The 'not at fault' requirement [ ] means that the defendant must not have been the first aggressor in the incident." *State v. Turner*, 2007-Ohio-1346, ¶ 24 (2d Dist.), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979).

**{¶27}** The jury was presented with radically different versions of how the altercation in this case unfolded. Sexton portrayed the neighbor as the initial aggressor and vice versa. The jury was tasked with assessing the credibility of their respective narratives. *See State v. Olsen*, 2023-Ohio-2254, ¶ 57 (11th Dist.) (observing, "[a] self-defense claim is generally an issue of credibility"). The guilty verdicts suggest that the jury afforded greater weight to the neighbor's version portraying Sexton as the initial aggressor. On the record before us, we cannot say the jury went astray in its assessment.

**{¶28}** The record contains objective evidence corroborating the neighbor's portrayal of the events leading up to the confrontation. The neighbor testified that he ended up traversing Sexton's yard on the day in question after his dog escaped his own unfenced backyard a few doors down. An outdoor video camera at a private residence in the neighborhood recorded the neighbor walking between two houses while gesturing towards the dog with his right arm. The dog, which was wearing a collar at the time, continued to run from him. Consistent with his self-described left-side weakness from the stroke, the neighbor walked rather than ran after the dog and held

his left arm slightly crooked at his side.

{¶29} Footage from another outdoor camera at a nearby landscaping business depicted the intersection of Poole Road and Cheviot Road. The neighbor could be seen attempting to corral the dog while a third party approached and tried to help. All the while the dog continued to run around, in and out of the camera frame. Both videos supported that Hank had gotten loose and was running about while the neighbor crossed through multiple yards trying to catch the dog. This was further supported by testimony from a State's witness who said she observed a man on the day in question walking outside towards Cheviot Road with an unleashed dog.

{¶30} At trial, the neighbor testified that Hank jumped into the open truck door as they crossed through Sexton's yard. He maintained the dog was climbing around inside the truck while he verbally tried to coax the dog out. Photographs depicting muddy paw prints on the seats and floormats and showing the wallet and cell phone lying askew coincided with Hank having run amok inside the vehicle.

{¶31} According to the neighbor, Sexton reached into the truck, grabbed Hank by the collar, and ended up pulling the collar off the dog. Sexton, on the other hand, denied leaving the truck door open, pulling the collar off the dog, or even seeing the dog until after the confrontation with the neighbor was over. Again, the evidence weighs in favor of the neighbor's version of events. Photographs admitted at trial depicted white hairs on the front seat in addition to the muddy paw prints on the seats and floormats throughout. While the dog could have jumped into the truck *after* the scuffle was over, the jury believed the neighbor. The record supports this assessment.

{¶32} Sexton maintained Hank made his first appearance only *after* Sexton and the neighbor physically clashed. Sexton expressly testified on direct examination that there was no dog in sight when he first saw the neighbor ostensibly rummaging

through the truck. But Sexton made an important statement in his testimony just a moment later:

> Q. Now, when you first confront him, do you even see a dog at that point in time?
>
> A. No.
>
> Q. So when he tells you, you know, what are you going to do about it, something to that effect, then what happens?
>
> A. I said, man, you are going to get out of my truck, you know, *get him out of here*. And he wouldn't do that.

(Emphasis added.) Read in context, the italicized "him" appears to refer to the dog. This lends strong credence to the neighbor's version of events. The fact that the collar was found lying directly beneath the driver's side door of the truck further corroborated that the dog was in the truck and the collar came off when Sexton forcefully attempted to remove the wayward animal.

{¶33} While a pocketknife undoubtedly qualifies as a deadly weapon, the state of the pocketknife at the scene further suggests the neighbor was not the initial aggressor. Detective Chris Cullman of the Colerain Township Police Department explained that the pocketknife contained a mechanism which locked the blade into place once deployed. And Officer Mike Stockmeier confirmed that the pouch to which the knife was clipped was found lying on the ground outside the truck. The knife was still firmly clipped to the pouch, not dangling, and the blade remained collapsed. These facts tend to contradict Sexton's insistence that the neighbor tried to use the knife against him.

{¶34} Sexton's appellate brief highlights several weaknesses in the State's case

in an attempt to discredit the neighbor's narrative. For one, Sexton testified that he closed the driver's side door to the truck when he ran inside the house during the downpour. He also stated that he left his phone and wallet on top of the closed center console to keep them from getting wet. He further maintained that the pouch containing the knife was secured inside the closed center console. Admittedly, it is not entirely believable that Sexton left the door to his truck standing open during a thunderstorm. Nor is it likely that he left the console lid standing open. However, these purported inconsistencies do not warrant the reversal of Sexton's convictions.

{¶35} To be sure, "[w]hen evidence is amenable to more than one construction, a reviewing court must give it the interpretation that is consistent with the judgment." *State v. Jordan*, 2022-Ohio-2566, ¶ 58 (1st Dist.), quoting *In re J.C.*, 2019-Ohio-4027, ¶ 20 (1st Dist.). The State offered an interpretation of the evidence during closing arguments that indeed accords with the jury's verdict. The assistant prosecutor challenged the notion that Sexton left his wallet and cell phone unattended and in plain view inside the truck for an hour simply because it was raining outside. The prosecutor offered that Sexton went outside after the rainstorm, put the items in the truck as he made to leave, forgot something, left the truck door open as he ran back inside, and then came back out and encountered the neighbor and Hank.

{¶36} While closing arguments are not evidence, attorneys use them to summarize the evidence and invite the trier of fact to draw certain conclusions therefrom. *See State v. Frazier*, 73 Ohio St.3d 323, 338 (1995) (noting that opening statements and closing arguments are not evidence); *John F. Bushelman Constr. v. Glacid Group*, 1996 Ohio App. LEXIS 2624, *9 (1st Dist. June 26, 1996) (referencing the function of closing arguments). The jury was tasked with assessing the credibility of the witnesses and was free to accept or reject any portion of the evidence and

respective narratives offered by the parties. *State v. Gasper*, 2023-Ohio-1500, ¶ 75 (1st Dist.), citing *State v. Fether*, 2012-Ohio-892, ¶ 44 (5th Dist.). That, they did.

**{¶37}** On this record, we are not persuaded by Sexton's contention that the weight of the evidence supports that the neighbor was the initial aggressor. Even if we were to find otherwise, we would not be inclined to reverse Sexton's convictions. The State need only disprove one element of a defendant's self-defense claim in order to defeat it. *State v. Griffin*, 2024-Ohio-4806, ¶ 26 (1st Dist.), citing *Messenger*, 2022-Ohio-4562, at ¶ 50. And, as discussed next, Sexton's self-defense claim unequivocally fails on the bona fide belief prong.

### c. *Bona fide belief of death or serious harm*

**{¶38}** The second element of a meritorious self-defense claim involving deadly force requires that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and his only means of escape was in the use of corresponding force. *See Messenger*, 2022-Ohio-4562, at ¶ 14. This element entails both objective and subjective considerations. *State v. McDonald*, 2023-Ohio-1987, ¶ 21 (1st Dist.). As this court explained:

> A defendant's belief that [ ]he was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that [ ]he sat in such danger. "[I]f the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that [ ]he was in imminent danger." The state may disprove self-defense by demonstrating that the defendant's belief was not objectively reasonable or that [ ]he did not have an honest

12

subjective belief that [ ]he faced imminent death or great

bodily harm.

*Id.*, quoting *State v. Wilson*, 2022-Ohio-3801, ¶ 13 (1st Dist.).

**{¶39}** Of note, "when lethal force is used in self-defense, the perceived threat to the accused must be of death or great bodily harm." *Mitchell*, 2023-Ohio-2604, at ¶ 25 (1st Dist.), quoting *State v. Sims*, 2005-Ohio-5846, ¶ 16 (8th Dist.). Put another way, the use of deadly force in self-defense must be reasonably proportionate to the perceived threat—self-defense "is not available unless the defendant shows that the force used to repel the danger was not more than the situation reasonably demanded." *State v. Terry*, 2023-Ohio-2074, ¶ 15 (1st Dist.), quoting *State v. Johnson*, 2009-Ohio-3500, ¶ 12 (6th Dist.). When the degree of force employed was so disproportionate that it evinced an "unreasonable purpose to injure," the defendant may not avail himself of the affirmative defense of self-defense. *Terry* at ¶ 15, quoting *State v. Waller*, 2016-Ohio-3077, ¶ 26 (4th Dist.).

**{¶40}** We turn first to the objective inquiry. Sexton and the neighbor were strangers to one another. According to Sexton, he walked out of his house and was confronted by a man rooting through his truck. He maintained that the neighbor taunted him and refused to leave. He insisted he struck the neighbor with the machete only after the neighbor picked up the pouch containing the pocketknife and advanced on him. Sexton maintained he feared the neighbor would cut or stab him, causing serious physical injury or death. He further insisted he delivered a second blow when the neighbor fell into him because he was still in fear for his life at the time. Sexton testified he felt shocked and stunned by the neighbor's actions.

**{¶41}** The jury did not find Sexton's narrative painting the neighbor as threatening to be credible. *See State v. Lawrence*, 2023-Ohio-3419, ¶ 41 (11th Dist.),

quoting *State v. Olsen*, 2023-Ohio-2254, ¶ 57 (11th Dist.), and *State v. Bentley*, 2023-Ohio-1792, ¶ 24 (11th Dist.) (emphasizing, "[a] self-defense claim is generally an issue of credibility[, and] [d]isputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact"). The record supports that a reasonable individual in Sexton's position—an individual who comes out of his house and must endure a stranger trying to get his dog out of the individual's truck—would not have been in fear for his life. The same conclusion follows even if the neighbor verbally challenged Sexton or refused to leave Sexton's property without his dog. This conclusion is all the more supported by the neighbor's physical limitations—he suffered a stroke a few years prior to this incident that weakened his left side—and the fact that the neighbor was older, smaller in stature, and noticeably more frail than Sexton.

**{¶42}** Nor was the amount of force employed by Sexton justified. Sexton testified that he stood 6'4" and weighed between 230 and 240 pounds at the time of the incident. He estimated the neighbor stood 5'10" and weighed about 160 pounds. Even if the neighbor did reach for the pouch containing the four-inch pocketknife, Sexton's use of the machete was disproportionate to any apparent danger. In his testimony, Detective Stockmeier emphasized the discrepancy between the implements involved or alleged to be involved. One has to be much closer in range to inflict harm with a pocketknife versus a machete. Moreover, as stated, the pocketknife was still clipped to the pouch and had not been opened. Accordingly, other than Sexton's allegation, there was no evidence supporting that the neighbor wielded the pocketknife at all during the confrontation. Given these circumstances, the weight of the evidence presented at trial reflects that Sexton did not have a bona fide belief that he faced death or great bodily harm necessitating the use of lethal force in response.

**{¶43}** In sum, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, we conclude that the jury did not clearly lose its way and create a manifest miscarriage of justice in rejecting Sexton's self-defense claim and finding him guilty of felonious assault. Accordingly, we overrule Sexton's first assignment of error.

## B. *Allied Offenses of Similar Import*

**{¶44}** In his second assignment of error, Sexton argues that the trial court wrongly imposed sentences on both felonious assault counts rather than merging them as allied offenses of similar import. The State concedes the error.

**{¶45}** Double jeopardy protections in both the United States and Ohio Constitutions preclude multiple prosecutions or punishments for the same offense. *State v. Pendleton*, 2020-Ohio-6833, ¶ 8. *See* Ohio Const., art. I, § 10; U.S. Const., amend. V; *see also* R.C. 2941.25. Pursuant to *State v. Ruff*, 2015-Ohio-995, a defendant charged with multiple offenses may be convicted of all of them if any one of the following is true (1) the conduct constitutes offenses of dissimilar import or significance, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation. *Id.* at ¶ 31. Convictions do not merge and separate sentences may be imposed where any of these three inquiries is answered in the affirmative. *Id.*

**{¶46}** Sexton's two counts of felonious assault were not dissimilar in import or significance, were not committed separately, and did not contemplate separate animi or motivations. Accordingly, as the State concedes, the offenses were subject to merger, and Sexton could only be sentenced on one of the two counts. While the trial court acknowledged the necessity of a single prison term, the court erred as a matter of law by imposing two concurrent terms in place of merger. *See State v. Williams*,

15

2016-Ohio-7658, ¶ 3 (ruling, "the imposition of concurrent sentences is not the equivalent of merging allied offenses"); *see also State v. Underwood*, 2010-Ohio-1, ¶ 31 (noting in this context that, "even when the sentences are to be served concurrently, a defendant is prejudiced by having more convictions than are authorized by law").

**{¶47}** Accordingly, we sustain Sexton's second assignment of error and remand the matter for resentencing on one of the two counts. *See Williams* at ¶ 30. The guilty findings on both counts of felonious assault remain intact. *See State v. Wilson*, 2011-Ohio-2669, ¶ 15. On remand, the State should elect which count to pursue upon resentencing. *Williams* at ¶ 30.

### *Conclusion*

**{¶48}** Because the record contains credible evidence to support that Sexton did not act in self-defense, we overrule his first assignment of error. Because the trial court erred as a matter of law in imposing concurrent prison terms rather than merging the two allied offenses, we sustain Sexton's second assignment of error, reverse the sentences, and remand the cause for resentencing.

Judgment affirmed in part, reversed in part, and cause remanded.

**ZAYAS** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.