[Cite as *State v. Brown*, 2025-Ohio-2351.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                  :        APPEAL NO.   C-240328
                                         TRIAL NO.    B-2205282
    Plaintiff-Appellee,     :

vs.                             :
                                         *JUDGMENT ENTRY*
DICARI BROWN,                   :

    Defendant-Appellant.    :


This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 7/3/2025 per order of the court.**


**By:**_____

      **Administrative Judge**

[Cite as *State v. Brown*, 2025-Ohio-2351.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                              :           APPEAL NO.   C-240328
                                                        TRIAL NO.    B-2205282
    Plaintiff-Appellee,                 :

  vs.                                       :

DICARI BROWN,                               :           *O P I N I O N*

    Defendant-Appellant.                :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 3, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Roger W. Kirk*, for Defendant-Appellant.

**MOORE, Judge.**

**{¶1}** Defendant-appellant Dicari Brown appeals the judgment of the Hamilton County Court of Common Pleas convicting him of murder and two firearm specifications. Brown asserts that his conviction was against the manifest weight of the evidence, and that his sentence with respect to the firearm specifications is contrary to law. For the reasons set forth below, Brown's arguments are not well taken, and the judgment of the trial court is affirmed.

## I.    *Factual and Procedural History*

**{¶2}** In the early hours of October 31, 2022, police responded to a report of a shooting in the Northside neighborhood. At the scene was Tyrese Woodkins, who had sustained a number of gunshot wounds and had died from his injuries. A week later, Brown surrendered.

**{¶3}** On November 10, 2022, a grand jury indicted Brown on five counts: (1) aggravated murder, in violation of R.C. 2903.01(A), (2) murder with specifications, in violation of R.C. 2903.02(B), (3) felonious assault with specifications, in violation of R.C. 2903.11(A)(2), and (4) and (5) menacing by stalking, in violation of R.C. 2903.211(A)(1). From April 24 to 26, 2024, the matter proceeded to a three-day jury trial.

**{¶4}** On the first day of trial, the State called the decedent's girlfriend ("L.T."). L.T. testified that she and Woodkins both worked at Walmart and that the two had been dating for two months. Before dating Woodkins, L.T. had dated Brown for approximately four-and-a-half years.

**{¶5}** L.T. testified that she and Brown had not had an amicable break up. L.T. recalled prior to the shooting that Brown broke into her apartment and confronted her and Woodkins. L.T. testified that Brown stated that he could have killed Woodkins,

before fleeing from the apartment.

{¶6} L.T. recalled that on the night of the shooting, Brown was following her. L.T. testified that Woodkins and some of her friends worked overnight at Walmart, and that night, she and the group ate in her car while on break. L.T. observed Brown in the Walmart parking lot, watching the group from his car. Despite L.T. moving her car, Brown followed L.T. across the parking lot, and the pursuit eventually escalated into a chase. L.T. testified that she was able to warn Brown that she was going to call the police, which prompted Brown to leave the Walmart parking lot. The State introduced footage from Walmart's security cameras that documented the chase.

{¶7} However, once L.T. left the parking lot, Brown again began following her. L.T. testified that Brown chased her while she was driving home but she eventually lost sight of him. L.T. stated that when she arrived home, she saw Brown waiting outside of her apartment. L.T. explained that she left, waited at a friend's home for a few hours, and hoped that Brown would be gone when she returned. While waiting, L.T. called Woodkins, and he insisted that he meet her at her apartment to ensure that she got safely inside.

{¶8} L.T. returned to her apartment around 5 a.m. Brown was there to confront her when she arrived. L.T. testified that Brown stood in front of her car and insisted that she either hit him or get out of the car. Woodkins arrived at the scene shortly after this initial confrontation and approached Brown. L.T. testified that Woodkins was holding a McDonald's bag and cup in his hands, and was asking Brown to let her walk inside.

{¶9} L.T. recalled Brown telling Woodkins "b***h don't up no gun on me," however L.T. never saw Woodkins reach for a gun. She next saw Brown shoot Woodkins multiple times before Woodkins collapsed. She then watched as Brown

stood over Woodkins's body and began shooting him in the back. L.T. testified that she heard Brown call Woodkins "stupid," and then saw him frisk Woodkins, find his gun, dismantle it, and toss the weapon on Woodkins's body. Brown then fled.

{¶10} The State called two additional witnesses, Dr. Benjamin Criss and Amanda Perkins. Dr. Criss, the coroner who performed Woodkins's autopsy, testified that Woodkins sustained 15 gunshot wounds. Dr. Criss explained that Woodkins's body was riddled with entry wounds across his front and back sides. Dr. Criss's autopsy report documented that Woodkins had been shot in the back five times, including once in the back of the neck. Ms. Perkins, a forensic criminalist, testified that the forensics team retrieved a McDonald's drink cup and bag next to Woodkins's body.

{¶11} On the final day of trial, Brown testified on his own behalf. Brown denied ever breaking into L.T.'s apartment, making threats to Woodkins, or chasing L.T. Brown explained that his parking lot antics were only meant as a joke, and that he was waiting outside of L.T.'s apartment because he wanted to speak to her. Brown explained that he was also joking when he told L.T. to run him over or to get out of the car.

{¶12} Further, Brown disputed L.T.'s recollection of his interaction with Woodkins. Brown testified that Woodkins approached him in an aggressive manner. Brown claimed that he saw the outline of a gun in Woodkins's pants, and that he only fired after seeing Woodkins reach for this weapon. Brown also denied shooting Woodkins once he had collapsed. Instead, he explained that he fled the scene in fear after firing the initial volley of shots at Woodkins.

{¶13} On April 30, 2024, the jury returned its verdicts, finding Brown guilty of count two, murder, with specifications for possessing and using a gun in the commission of the murder, and count three, felonious assault, with specifications for

possessing and using a gun in the commission of the assault. The jury returned not-guilty verdicts on all remaining counts.

{¶14} For the purposes of sentencing, the court merged Brown's offenses for murder and felonious assault, and imposed a sentence ranging from 15 years to life for murder. The court merged both gun specifications attached to the murder count and imposed a three-year sentence and also merged the gun specifications attached to the felonious-assault count and imposed a three-year sentence. The court ordered the sentences to be served consecutively. As a result, the court sentenced Brown to a prison term of 21 years to life and credited him for 563 days served.

{¶15} On June 10, 2024, Brown timely appealed.

## II. Analysis

{¶16} Brown posits two assignments of error on appeal. First, Brown argues that the jury's verdict was against the manifest weight of the evidence. Second, Brown insists that the court erred in imposing consecutive sentences for the gun-specification convictions. We consider these arguments in turn.

### A. Manifest Weight

{¶17} In his first assignment of error, Brown argues that his conviction was against the manifest weight of the evidence. Specifically, Brown asserts he argued an effective self-defense claim, and that the State failed to disprove his claim.

{¶18} A review of the manifest weight of the evidence concerns the plaintiff's burden of persuasion. *State v. Sexton*, 2025-Ohio-718, ¶ 20 (1st Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 26. In evaluating a manifest-weight challenge, we review whether the trier of fact created a manifest miscarriage of justice in resolving conflicts in the evidence. *Id.* We afford substantial deference to the credibility determinations of the trier of fact because the trier directly observes the witnesses

during the proceedings. *Id.* at ¶ 21. A conviction may only be reversed under a manifest-weight review in exceptional cases where the evidence weighs heavily against the conviction. *Id.* A conviction is not against the manifest weight simply because the fact finder believed the prosecution's testimony. *Ohio v. Wilson*, 2022-Ohio-3801, ¶ 11 (1st Dist.).

**{¶19}** Under Ohio law, to present a viable self-defense claim in a deadly-force case, the defendant must show that (1) he or she was not at fault in starting the affray, (2) he or she had a good faith belief that they were in imminent danger of death or severe bodily harm, and reciprocating such force was the only means of escape, and (3) he or she did not violate a duty to retreat. *Sexton* at ¶ 22. However, Ohio's recent "stand your ground" law has been interpreted to absolve the defendant of his or her duty to retreat, so long as the defendant was in a location in which he or she had a lawful right to be. *Sexton* at ¶ 25, citing *Messenger* at ¶ 17, citing R.C. 2901.09(B). Because he was lawfully on a public street, Brown had no duty to retreat.

**{¶20}** Once a defendant has presented evidence to support their claim, the burden shifts to the State to disprove at least one of the elements. *State v. Mitchell*, 2023-Ohio-2604, ¶ 16 (1st Dist.), citing *State v. Gibson*, 2023-Ohio-1640, ¶ 10.

### *Not at Fault*

**{¶21}** The first element of a self-defense claim requires the defendant to demonstrate that the defendant was not at fault in "creating the situation giving rise to the disturbance [i.e., the affray]". *Sexton*, 2025-Ohio-718, at ¶ 26 (1st Dist.), citing *Messenger,* 2022-Ohio-4562, at ¶ 14. The rationale for the first element is that "[a] defendant, having willingly advanced toward a volatile situation cannot rely on the affirmative defense of self-defense." *State v. Venable*, 2025-Ohio-335, ¶ 53 (7th Dist.), quoting *State v. Walker*, 2021-Ohio-2037, ¶ 19 (8th Dist.).

7

**{¶22}** Based on the record, the State disproved the first element. The jury considered testimony that Brown chased L.T. with his car, waited in front of her residence, confronted her at her vehicle, and demanded that she get out of the car. While Brown claimed his antics were a joke, his behavior that evening was the catalyst that ignited his ultimate confrontation with Woodkins.

**{¶23}** Even if the timeline were to be constrained to just when Woodkins approached Brown, the State effectively demonstrated that Brown initiated the altercation. While Brown suggests that Woodkins started the dispute when Woodkins approached him at L.T.'s car, L.T. testified that she observed Brown and Woodkins speaking briefly, and then Brown drew his handgun and began shooting. Determining who initiated an altercation is heavily dependent upon the credibility of the witnesses. *State v. Gurton*, 2024-Ohio-2971, ¶ 19 (1st Dist.). Here, the jury weighed the competing narratives and determined that the State's presentation of facts was more credible, and nothing in the record undermines the jury's conclusion that Brown caused the disturbance.

### *Bona Fide Belief*

**{¶24}** Even if we accepted Brown's argument that Woodkins was the initial aggressor, the State disproved the second element of Brown's self-defense claim by showing Brown used excessive force given the circumstances.

**{¶25}** An actor's invocation of self-defense is not limitless, as an actor's belief that deadly force is necessary must be rooted in the idea that such force is necessary to subvert the risk of lethal or great bodily harm. *Messenger*, 2022-Ohio-4562, at ¶ 14. The second self-defense element may be disproven by establishing that that defendant lacked either a reasonable objective or an honest subjective belief that he or she faced imminent death or great bodily harm. *State v. Smith*, 2020-Ohio-4976, ¶ 56 (1st Dist.).

**{¶26}** Firing multiple shots may undermine a self-defense claim. *State v. Roland*, 2017-Ohio-557, ¶ 21 (10th Dist.). When an imminent threat has ceased, self-defensive actions become unreasonable. *See State v. Clarke*, 2024-Ohio-2921, ¶ 25 (1st Dist.) (holding that where the alleged aggressor is incapacitated, the continued use of defensive force is unreasonable); *Wilson*, 2022-Ohio-3801, at ¶ 17 (1st Dist.) (concluding that the cessation of imminent danger rendered the defendant's discharge of her gun multiple times unreasonable); *State v. Shaw*, 2025-Ohio-301, ¶ 47-48 (2d Dist.) (holding that defendant's action of following a retreating assailant and shooting the assailant three times in the back was an unreasonable use of force).

**{¶27}** The evidence before the jury demonstrates that Brown's use of force was unreasonable. Although Brown had no duty to retreat, the jury could have reasonably concluded that the force used by Brown in shooting Woodkins 15 times was grossly disproportionate and therefore unreasonable. The jury heard competing testimony from L.T. and Brown about whether Brown had reached for a gun and also heard competing explanations for how Woodkins was shot in the back. While Brown explained that he saw Woodkins reach for a weapon and that he shot so much because he was scared, L.T. stated that Woodkins had not reached for his gun, Brown was the initial aggressor, Brown shot Woodkins in the chest until he collapsed and then Brown shot Woodkins in the back and neck. Ultimately, the jury found Brown's narrative unpersuasive. Given the record before us, the evidence presented at trial supports the finding that Brown lacked an honest subjective belief that he faced lethal or severe bodily harm and had no reasonable objective basis for such a belief.

**{¶28}** Upon weighing all evidence, we cannot say that the jury clearly lost its way in rejecting Brown's self-defense claim. Accordingly, we overrule Brown's first assignment of error.

9

### B. Consecutive Sentencing

**{¶29}** In his second assignment of error, Brown argues that the court erred when it sentenced him for the gun specification related to the felonious assault, because the underlying offense had been merged. Further Brown asserts that the court also erred when it ordered the gun-specification sentences to be served consecutively. Brown suggests that the application of this sentencing regime violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. We overrule this assignment on the authority of *State v. Bollar*, 2022-Ohio-4370, where the Ohio Supreme Court addressed Brown's exact argument and held that R.C. 2929.14(B)(1)(g) permits multiple sentences for gun specifications attached to each offense the defendant was found guilty of, despite the underlying offenses merging for purposes of sentencing.

**{¶30}** Where a defendant is convicted of one or more specified felonies, including murder and felonious assault, R.C. 2929.14(B)(1)(g) provides that a trial court shall impose consecutive sentences for the two most serious firearm specifications. In *Bollar*, the Court held that "the plain language of R.C. 2929.14(B)(1)(g) requires that certain offenders . . . receive separate prison terms for *convictions* on multiple firearm specifications." (Emphasis added.). *State v. Bollar*, at ¶ 1, 25. The Court resolved a conflict amongst lower courts and specifically interpreted "convicted" as applied to R.C. 2929.14(B)(1)(g) meant to be found guilty. *Id*. at 14. To interpret R.C. 2929.14(B)(1)(g) to only permit the imposition of sentences for each specification where the defendant is sentenced for two or more felonies would alter the statute's language, an action reserved for the general assembly. *Id*. at ¶ 24.

**{¶31}** Brown asserts that having the gun-specification sentences run consecutively is fundamentally unfair, and cites to *State v. Ali*, 2024-Ohio-5325 (8th

Dist.). However, *Ali* runs antithetical to Brown's argument, as the court held that ordering consecutive sentences for gun specifications where R.C. 2929.14(B)(1)(g) was implicated was appropriate. *Id.* at ¶ 11. The *Ali* court noted that *Bollar* had clearly spoken on the issue, and an appellate court lacks the authority to review or overturn a decision of the Ohio Supreme Court. *Id.* at ¶ 12. Similarly, the *Ali* court held that double jeopardy is not violated where a court complies with R.C. 2929.14(B)(1)(g) and imposes a separate sentence on an additional specification. *Id.* at ¶ 15. Accordingly, Brown's second assignment of error is overruled.

### III.    Conclusion

**{¶32}** We therefore affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE, P.J.,** and **BOCK, J.,** concur.