[Cite as *State v. Smothers*, 2025-Ohio-5250.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-230663 |
|  |  | TRIAL NO. | B-1800336 |
| Plaintiff-Appellee, | : |  |  |
|  |  |  |  |
| vs. | : |  |  |
|  |  | *JUDGMENT ENTRY* |  |
| BRIAN SMOTHERS, | : |  |  |
|  |  |  |  |
| Defendant-Appellant. | : |  |  |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 11/21/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *State v. Smothers*, 2025-Ohio-5250.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL NO.    C-230663
                                                   TRIAL NO.     B-1800336
    Plaintiff-Appellee,            :

    vs.                            :
                                                   *O P I N I O N*
BRIAN SMOTHERS,                         :

    Defendant-Appellant.           :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 21, 2025


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Roger W. Kirk*, for Defendant-Appellant.

**MOORE, Judge.**

**{¶1}** On the morning of January 1, 2018, police were called to a mobile-home park in Sharonville, Ohio. They were responding to a report that the nude body of a woman was lying behind a dumpster near one of the trailers.[1] While police were conducting their investigation, defendant-appellant Brian Smothers came out of his trailer. Smothers explained to the officers that he needed to leave for work and asked if the police and emergency vehicles blocking his car could be moved. Smothers' request was accommodated, the vehicles were moved, and he drove off—but not to work. Instead, Smothers drove to his father's home in Grant County, Kentucky.

**{¶2}** After Smothers drove off, the investigating officers learned that the dead woman was Smothers' wife, L.S. A police broadcast was made to be on the lookout for Smothers and the dark blue Hyundai Santa Fe he was driving, and warrants were issued for his arrest and for the search of his car. When the police broadcast reached the Grant County Sheriff's Office, they sent an officer to the house of Smothers' father, where Smothers was found and arrested. Smothers' car was parked in the driveway of his father's house. The Grant County Sheriff seized the vehicle and held it until it was transported to the Sharonville Police Department where it was searched.

**{¶3}** In this appeal, Smothers challenges his convictions for murder, gross abuse of a corpse, and tampering with evidence in seven assignments of error, alleging (1) the trial court erred by denying his motion to suppress, (2) he was prejudiced by prosecutorial misconduct, (3) the admission of L.S.'s autopsy photos unfairly inflamed the passions of the jury, (4) his convictions were based on insufficient evidence, (5) the State committed a *Brady* violation by destroying an untested sexual-assault kit,

---

[1] According to the affidavit to the arrest warrant, a neighbor and her nine-year-old daughter saw the body lying behind the dumpster which prompted the call to police.

(6) the trial court erred by denying Smothers' proposed jury instruction regarding the alleged *Brady* violation, and (7) the trial court erred by overruling his motion for a new trial based on juror misconduct.

{¶4} For the reasons stated herein, we affirm the trial court's judgment.

## *I. Factual and Procedural History*

{¶5} Smothers was indicted for two counts of murder, special felonies, in violation of R.C. 2903.02(A) and (B), one count of felonious assault, a second-degree felony, in violation of R.C. 2903.11(A)(1), one count of gross abuse of a corpse, a fifth-degree felony, in violation of R.C. 2927.01(B), and two counts of tampering with evidence, third-degree felonies, in violation of R.C. 2921.12(A)(1).

## *A. The Hearing on Smothers' Motion to Suppress*

{¶6} Smothers filed a motion to suppress citing *Collins v. Virginia*, 584 U.S. 586 (2018), and arguing that the automobile exception to the warrant requirement does not permit an officer to enter a home or its curtilage to search a vehicle. *Id.* at 600. Smothers asserted that the affidavit in support of the warrant was defective because his car was not located in the jurisdiction of the issuing judge when the warrant was issued on January 1, 2018. Instead, his car was at his father's home in Grant County, Kentucky. Smothers argued that the Sharonville police conducted a warrantless search of his car because it did not arrive at the police department until January 2, 2018.

### Detective Brad Hondorf's Testimony

{¶7} Sharonville Police Detective Brad Hondorf assisted with the investigation of L.S.'s death. Hondorf testified that during the initial investigation, Smothers came out of his trailer as the paramedics were leaving and asked the officers to move their cars. After they did, he left the scene. Hondorf explained that at that

point, L.S.'s identity was unknown. Hondorf explained that after the police cars and emergency vehicles were moved, the officers saw "drag marks" in the snow leading from where L.S.'s body was found to Lot 15—Smothers' trailer.

{¶8} After searching their database, the officers learned that police had recently responded to a report of domestic violence at the Smotherses home. Hondorf also testified that based on previous photos, they were able to identify L.S. by her "distinct tattoos." They used a photo of Smothers to confirm his identity with the officer whom Smothers spoke to prior to driving away. Smothers' neighbors also reported to the officers that they saw Smothers leaving in his car.

{¶9} Hondorf explained that Smothers was permitted to leave because neither he nor the body of L.S. had been identified at that point. Hondorf testified that Smothers became a suspect after he had left and the officers saw the drag marks and identified the body. He further explained that the investigators became interested in the car after they reviewed the video from a neighbor's surveillance camera. That footage showed a "subject throughout the night going back and forth" "dragging something the size of a body," and the pathway indicated that the subject made several trips from the dumpster to the area where Lot 15 was, including carrying what looked like a garbage bag towards the dumpster.

{¶10} A warrant was issued for Smothers' arrest for abuse of a corpse. Hondorf testified that the Grant County Sheriff's Department was notified that Smothers' father lived in that county, and on January 1, 2018, a Grant County deputy sheriff went to the home of Smother's father where Smothers and his car were found. Hondorf explained that Sharonville police believed that L.S.'s missing clothes, blood, or other evidence could be in Smothers' car. After Smothers was arrested, his car was impounded at the Grant County Sheriff's Department.

{¶11} During his testimony, Hondorf conceded that Smothers' car was not in Hamilton County when he submitted the affidavit for a search warrant for the car on January 1, 2018. He also conceded that the car did not arrive at the Sharonville Police Department until January 2, 2018. t. Hondorf testified, however, that the police had no intention of executing the search warrant on Smothers' car until it was in Hamilton County.

{¶12} Hondorf testified that the warrant to search Smothers' car was obtained because, once the car was found, it would be seized and transported to the Sharonville Police Department to be searched for evidence. He explained that probable cause to search the car arose when Smothers, later identified as a suspect, had left the scene in his car.

**Detective Scott Conrad's Testimony**

{¶13} Detective Scott Conrad, with the Grant County Sheriff's Office, testified that their dispatch received a call from Sharonville police asking for assistance in locating Smothers and his car. Conrad conceded that the car was parked on private property when the Grant County sheriffs seized it, and they did not have a search warrant issued by a judge in Kentucky. Conrad, however, explained that, at that point, Smothers had been charged in Grant County as a fugitive from another state, and there was a National Crime Information Center ("NCIC") warrant for his arrest.

{¶14} Conrad testified that the Grant County deputy sheriffs went to the address given by Sharonville police and saw Smothers walking to the front door and his car parked in the driveway. Conrad explained that the vehicle was not searched in Grant County and that the sheriff's office taped the doors of the car shut to ensure that it was not searched until it was in Sharonville.

**The Trial Court Denies Smothers' Motion to Suppress**

**{¶15}** The trial court, referring to the "Ohio Arrest Search and Seizure" manual, stated that there are not "any rules [under the automobile exception] that bear a magic line, at the border of Ohio, and they can't go into another jurisdiction, like Kentucky." The court stated that "the whole idea about the auto[mobile] exception was to give officers an opportunity to follow a very inherent mobility of a vehicle," which "creates circumstances of such exigency that it is practically a necessity." The court added that individuals have a reduced expectation of privacy where a warrantless search is based on probable cause. The court stated that there was probable cause to search Smothers' car because L.S.'s body was found behind the dumpster, tracks led back to the Smotherses trailer, the video showed someone dragging something to the dumpster, and Smothers, the main suspect, left the scene in his car. The court further stated that no warrant was needed to seize the vehicle and hold it pending the search as the "Supreme Court has said that a car that has been seized and brought to police headquarters and even sits as long as two weeks, there was no need for a search warrant." The trial court denied the motion to suppress, and the case proceeded to trial.

### *B. The Trial*

### K.C.'s Testimony

**{¶16}** K.C. testified that she knew Smothers and L.S. She testified that around 9:30 a.m. on January 1, 2018, she looked outside of her window and saw a body lying by the dumpster. She stated that she went to see if the person was okay but saw red spots in the snow, that the woman was naked, and there was blood going down her chest and nose. Realizing that the woman was dead, she called 9-1-1.

### Greg Shewbridge's Testimony

{¶17} Greg Shewbridge, an EMT with the Sharonville Fire Department, testified that once the emergency vehicles and police cars were moved to allow Smothers to leave, an officer showed Shewbridge that there were drag marks coming from Trailer 15, which was the trailer that Smothers came out of and lived in. Shewbridge stated that this caused him concern that "the suspect of a crime had just fled the scene."

### Officer David Landsberg's Testimony

{¶18} Officer Landsberg, a Cincinnati police criminalist, was called to the scene by Sharonville officers. He testified about what he observed at the scene and identified the photographs taken at the scene as they were introduced into evidence. Officer Landsberg described the drag marks and blood found along the trail from Trailer 15 to the dumpster and described the shoe prints found in the snow along the trail and at the base of the steps of Trailer 15. Officer Landsberg testified that the police and medical responders were careful not to disturb the shoe imprints. Officer Landsberg also explained that there were no signs of forced entry into the trailer.

{¶19} Officer Landsberg also participated in the search of Smothers' car—which had crime tape around it before the search began—at the Sharonville police station. Officer Landsberg testified that L.S.'s cell phone was found on the front passenger seat, and "reddish stains" were found on and above the dials used to adjust the driver's seat. A navy-blue sweatshirt with different stains was found in the back of the car along with green towels with reddish stains that were found in the trunk. Officer Landsberg testified that the shoe print that he obtained from the floor mat of the driver's side matched the shoe prints found on the trail of drag marks at the scene.

### Officer Lee Jacobs' Testimony

**{¶20}** Officer Lee Jacobs testified that L.S.'s purse was found in the front room of Smothers' trailer and that Smothers' blood was found on the purse strap. Officer Jacobs described seeing a "person walking back and forth" and what appeared to be a "body or something very large" near the dumpster on the surveillance video from a neighboring trailer, which prompted the officers to search the dumpster. Jacobs testified that the contents in the garbage bag recovered from the dumpster included jeans that had a "seeping brown stain," a soiled pair of women's underwear that had been torn or cut, and mail belonging to Smothers. He also testified that soiled towels and L.S.'s cell phone were found in Smothers' car.

### Michael Trimpe's Testimony

**{¶21}** Michael Trimpe, a trace evidence examiner with the Hamilton County Coroner's crime laboratory, testified that he determined that the boot prints found at the scene matched the boots that Smothers was wearing when he was arrested.

### E.M.'s Testimony

**{¶22}** E.M. was the neighbor whose surveillance camera captured the person dragging what was discovered to be L.S.'s body to the dumpster and walking back and forth. E.M. testified that in reviewing his surveillance footage, he noticed that his maroon truck looked gray due to the infrared lights on the camera.

### Dr. Karen Looman's Testimony

**{¶23}** Dr. Karen Looman was a deputy coroner with the Hamilton County Coroner's Office when she conducted L.S.'s autopsy. Dr. Looman testified that, while the coroner's office typically conducts an autopsy within 24 hours of receiving a decedent's body, L.S.'s autopsy could not be performed for two days because her body was completely frozen after being left outside in the cold.

### *The Autopsy Photographs*

**{¶24}** Dr. Looman testified to the condition of L.S.'s body and identified photographs and diagrams of the autopsy, which were introduced into evidence. The photographs showed that L.S.'s body was nude when it arrived at the coroner's office, had to be thawed, and reflected injuries that had occurred both before and after death.

**{¶25}** Defense counsel objected to the photographs at sidebar, arguing that they were cumulative and the probative value was not outweighed by prejudice. The trial court overruled the objection, stating that the State was putting on evidence regarding the count for gross abuse of a corpse, and there had been "very few photographs that would be duplicative."

**{¶26}** Dr. Looman continued to testify to the injuries found on L.S.'s legs, heels, and various areas of her face and head. Dr. Looman noted there was dirt on each heel which was consistent with the body being dragged. Dr. Looman testified that, due to the injuries on L.S.'s face and hemorrhaging in her eyes, she conducted a forensic neck dissection to determine whether L.S. had been strangled. Photographs depicting hemorrhaging of the muscle of L.S.'s throat, thyroid cartilage, and hyoid[2] along with diagrams of the human throat were introduced as Dr. Looman explained the process of the forensic neck dissection. The photograph of L.S.'s throat showed trauma and that the thyroid cartilage was broken. Autopsy photographs showing the examination of L.S.'s head and exposure of her skull were introduced to help Dr. Looman explain the blunt force trauma that L.S.'s head sustained prior to her death.

**{¶27}** Dr. Looman testified that the injuries that L.S. sustained showed that she died due to asphyxia by strangulation. She explained that a strangling victim tends

---

[2] The hyoid bone is a crescent-shaped bone at the front of the neck. *See* https://my.clevelandclinic.org/health/body/hyoid-bone (accessed Oct. 20, 2025) [https://perma.cc/Y58D-8L86].

to struggle with their assailant, including scratching them. Dr. Looman testified there were signs that L.S. attempted to fight off her assailant, and that her fingernails were cut to test for DNA. As discussed in more detail below, Dr. Looman also testified that she performed a sexual-assault examination, swabbing different parts of L.S.'s body and placing those swabs in a "sexual-assault kit" before washing the body off.

{¶28} Dr. Looman testified that the coroner's lab was relocated from Eden Avenue in Avondale to the city of Blue Ash. Dr. Looman further explained that in preparation for that move, the untested sexual-assault kit was destroyed. Dr. Looman added that she typically would not have the kit destroyed with a homicide case, and no other evidence in this case was destroyed.

### Jennifer Dillon's Testimony

{¶29} Jennifer Dillon, a Cincinnati police criminalist, testified to conducting a cell-phone analysis on Smothers' and L.S.'s cell phones. She testified that the phone records that she reviewed showed that neither phone was moved from the vicinity of the Smotherses trailer overnight, prior to L.S.'s body being discovered.

### Tracy Sundermeier's Testimony

{¶30} Tracy Sundermeier, a forensic biologist with the Hamilton County crime laboratory, recalled conducting DNA testing on swabs from blood found along the drag marks in the snow, a purse strap, a black T-shirt, a pair of boots, blue jeans, a black hooded sweatshirt, towels, swabs labeled to have been taken from Smothers, fingernail clippings from L.S., and bodily fluids from L.S. and Smothers. She explained that the blood found in the drag marks and on Smothers' jeans and boots belonged to L.S., and the blood on the black T-shirt belonged to Smothers.

### C.  The Hearing on Smothers' Motion to Dismiss

{¶31} Smothers moved to dismiss the charges against him or, in the

alternative, sanction the State's failure to preserve the untested sexual-assault kit.[3] He argued that R.C. 2933.82 required the State to preserve the swabs for 30 years following a conviction or as long as the "act" remains unresolved, and, the destruction of the untested kit warranted dismissal of his charges or "other appropriate sanctions."

### Dr. Looman's Testimony

**{¶32}** Dr. Looman testified that she conducted the sexual-assault examination before L.S.'s body left the coroner's office "out of an abundance of caution" that L.S. could have been a victim of sexual homicide as her body was found nude. Dr. Looman again testified that the autopsy revealed no signs of sexual assault—particularly, no injuries to L.S.'s genitals. She testified that results from the swabs would not have determined whether any sexual contact was consensual. Dr. Looman further testified that only L.S.'s and Smothers' DNA were found on L.S.'s body.

**{¶33}** Dr. Looman explained that swabs from the kit are stored and would have been tested at the request of the police department or the State, but since there was no request, the swabs were never tested. Dr. Looman further explained that the coroner's office needed to determine what materials did not need to go to the new facility when the office moved.

**{¶34}** Dr. Looman testified that either the "evidence receiving" or "DNA" department at the coroner's office requested that the sexual-assault kit for L.S. be destroyed. Dr. Looman explained that she reviewed Smothers' case and, as it had been pending for nearly three years and she had no indication from the police reports or the State that sexual assault was alleged, the kit was destroyed in December 2020. Dr. Looman testified that the kit was the only item that she permitted to be destroyed in

---

[3] It is not readily apparent from the record whether he made an oral motion or if a clerical error resulted in the motion not being entered on the docket.

Smothers' case.

**{¶35}** While Dr. Looman stated that authorizing the destruction of the kit was a mistake, she also testified that any results from the test would be purely speculative even if L.S. had engaged in sexual activity prior to her death.

### Detective Hondorf's Testimony

**{¶36}** Hondorf testified that he was present during the autopsy, the decision to conduct a sexual-assault examination was the coroner's decision, and he had not asked that the sexual-assault kit be tested for DNA. He added that no one from the police department requested that the kit be destroyed.

### The Trial Court Denies Smothers' Motion to Dismiss

**{¶37}** Defense counsel argued in closing that the sexual-assault kit was destroyed in violation of R.C. 2933.82. Counsel asserted that the coroner failed to provide the proper notifications, and the kit would not have been impractical to store. Counsel initially expressed uncertainty that the evidence would have been exculpatory but later stated it would have been exculpatory evidence if it showed that L.S. had engaged in intercourse with someone other than Smothers prior to her death.

**{¶38}** The State countered that any evidence derived from testing the kit would be purely speculative, and thus, not materially exculpatory but rather potentially useful. The State added that there was no bad faith on Dr. Looman's part; citing *Arizona v. Youngblood*, 488 U.S. 51 (1988), the State asserted that Smothers failed to show otherwise because Dr. Looman's testimony that it was a mistake to destroy the kit did not demonstrate bad faith, which requires dishonesty, conscious wrongdoing, or an ulterior motive.

**{¶39}** The trial court stated that it "wholeheartedly" agreed with the State's position and denied Smothers' motion to dismiss.

### D. The Trial Continues

**Detective Hondorf's Testimony**

{¶40} Hondorf testified that L.S.'s blood was found on Smothers' jeans, left boot, jacket, and the strap of the purse found in the Smotherses trailer. He further testified that there were scratches on Smothers' face when he was arrested and Smothers' DNA was found underneath L.S.'s fingernails. Hondorf recalled participating in the search inside the dumpster that L.S. was found lying near, and that the garbage bag matched those found inside of the Smotherses trailer.

{¶41} Hondorf stated that officers had no reason to believe that a sexual assault took place. He testified that officers investigated R.P.–an alleged paramour of L.S.–as a potential suspect in L.S.'s death but they found no evidence regarding R.P.

**Smothers' Testimony**

{¶42} Smothers testified that L.S. scratched his face around 9:30 p.m. on New Year's Eve during a disagreement about Smothers' father having the phone numbers of the mothers of Smothers' other children. Smothers asserted that L.S. scratched his face because he laughed at her after she told his father that, unlike those women, she "wasn't going anywhere." Smothers testified that L.S. then told him that she was going to "drink all the alcohol" and have sex with someone else.

{¶43} Smothers testified that he had fallen asleep at 7:30 p.m., and L.S. was sitting in the back bedroom of the trailer when he woke up at 9:30 p.m. He stated that he asked L.S. to wake him up at 11:30 p.m. and then went back to sleep.

{¶44} Smothers testified that L.S. was supposed to wake him at 5:45 a.m. so he could drive her to work, and he had plans to visit his father in Williamstown, Kentucky. Smothers stated that he woke up at 3:00 a.m. and the front door of the trailer was "standing wide open and the heater had been turned off." He testified that

he assumed that L.S. was in the back bedroom where the curtain was "closed all the way" and that L.S. must have left the door open to "freez[e] [him] out."

{¶45} Smothers testified that when he did not see L.S. in the back bedroom at 6:30 a.m. he figured she had gone to work. He testified that he saw her cell phone and "started to go through" it. He stated that he saw messages between L.S. and her friend, and L.S. stated that she was fed up with Smothers passing out and she was planning on leaving to be with another man, so Smothers figured that was where she went.

{¶46} Smothers testified that the person dragging "something" in the footage from the neighbor's home-surveillance camera was a different person than shown in the State's four subsequent videos, but it was not him. On cross-examination, Smothers testified that the person in the video appeared to be wearing a hoody, pants, and "shoes of some kind" and "dragging" his wife but refuted that they were wearing the same clothing as he was when he was arrested because the colors were "reversed." He conceded that the footage shows a person carrying a bag in the direction of the dumpster, and the person looked directly at the camera. He agreed that the drag marks found by police came from his trailer but contended that the marks started in the front yard and L.S. was killed in the "general vicinity" of his trailer versus inside of it. He asserted that he was asleep at the time the activity that was caught on video occurred.

{¶47} Smothers testified that, by the time the police arrived, he had "smoked a joint" and had three shots of vodka so he wanted to "get away from" them as he had previously been arrested while being intoxicated around the police. He testified that Officer Bookman was putting up crime-scene tape when he asked if he could leave because he needed to go to work. Smothers stated that he did not tell the police that he really was going to visit his father because the police would be more likely to allow him to leave if he had to go to work.

{¶48} Smothers testified that he was halfway to his father's house when he realized L.S.'s phone was in his pocket, which was a "force of habit" because he had disconnected his cell phone and only used her phone. He stated that he planned to return to Sharonville to pick L.S. up from work around 2:00 p.m. or 3:00 p.m.

{¶49} Smothers testified that he was sitting on his father's couch when the Grant County sheriffs called him out of the house and arrested him. He stated that he did not know why he was being arrested until he got to the sheriff's office, and a deputy told him there was a felony warrant from "another state" for abuse of a corpse. He testified that he discovered that he was arrested for killing L.S. after he was placed in a holding cell. Smothers repeatedly denied killing L.S. during his testimony.

### *The State Refers to Smothers as a Liar*

{¶50} While cross-examining Smothers about his infidelity in his marriage with L.S., the prosecutor stated that Smothers "quite frankly just cheated in almost every relationship that [he] ever had." The prosecutor asked, "You have lied over and over and over to the most important people in your life; is that correct?" and "You lied to [the police], hey, I'm going to work?" The prosecutor also stated that Smothers had lied in his "most important relationships" to cheat, and, referring to the trial, that he could not "think of a better time to lie . . . ." Smothers did not object to either statement.

### *Counsel Asserts that the State Violated Smothers' Fifth Amendment Rights*

{¶51} The following exchange also took place during cross-examination:

Q. Yesterday, sir, was the first time that anyone heard any of this information that you gave us; isn't that correct?

A. Other than my lawyers, yes.

Q. Right. Why didn't you tell anybody about this stranger that killed your wife sir?

A. Because I didn't know anything about the stranger that killed my wife until I got the discovery. I didn't even know my wife was dead until I got arrested.

Q When you found out she was dead, why didn't you share any of this information?

A. Because I'm constitutionally protected to only have to speak to my attorney.

Q. Don't you want to find your wife's killer, sir?

A. Absolutely.

Q. Don't you think law enforcement's job is to find [L.S.'] killer, sir?

A. I do believe it is.

Q. You want to help, correct?

A. I would help them if they came to me. Never once did law enforcement try and re-interview me.

Q. They are not allowed to contact you.

{¶52} At sidebar, defense counsel asserted that being asked why he did not tell law enforcement a stranger killed his wife violated Smothers' right to remain silent and moved for a mistrial. In response to the State's argument that Smothers waived his right to remain silent by taking the stand, defense counsel argued that Smothers' right to remain silent upon his arrest is distinguishable from waiving this right by testifying in his own defense. The trial court, while cautioning the State in its line of questioning, concluded that, by bringing up the new theory that a stranger killed L.S., the State had the right to ask why Smothers did not share this information before.

**The Jury Finds Smothers Guilty**

{¶53} The jury found Smothers guilty on all six counts. The trial court merged

the second count of murder and the felonious-assault count with the first count of murder for sentencing purposes. Smothers was ordered to serve the sentence for murder consecutively to the sentence for gross abuse of a corpse and serve the sentences for both counts of tampering with evidence concurrently with the sentences in the other counts, for an aggregate sentence of 16-years-to-life imprisonment with a jail-time credit of 1,675 days.

### E. *Smothers' Motion for a New Trial*

**{¶54}** During the polling of the jury, juror T.L. made a statement to the effect that she could see how the infrared feature on her own home-surveillance footage affects the colors of objects. Smothers filed a motion for a new trial, alleging that T.L. conducted an experiment that affected the outcome of the trial.

**{¶55}** The trial court held an evidentiary hearing on Smothers' motion for a new trial based on juror misconduct.

**{¶56}** During the hearing, T.L. testified that, after deliberations, she had discussed with some jurors that she was looking at camera footage on her cellular phone from her Ring camera recordings and noticed the colors were different "on infrared," which she believed turns on at night. She stated it was not an experiment, and that she looked at footage from the Ring camera from her phone all the time. T.L. explained that she mentioned what she saw on her camera footage while the jurors were talking to the attorneys, not while watching the video evidence or during deliberations. She denied looking at the cameras just to see if "they reversed colors."

**{¶57}** On cross-examination, T.L. clarified that the jury was waiting to be called back into the courtroom to deliver the verdicts when she mentioned that she had noticed that the colors were different in the footage of her cameras. T.L. testified that the colors of the camera did not impact her conclusions of Smothers' guilt, and

18

the evidence she considered was Smothers' possession of L.S.'s cell phone, Smothers' version of his wife's whereabouts, and the evidence found in the garbage bag with L.S.'s soiled undergarments. She added that she was tasked with going through the evidence which would point to Smothers' innocence, but the other evidence showed that he was guilty of murder.

**{¶58}** The other 11 jurors were also questioned during the hearing about T.L.'s comments. Three of the other jurors stated that they were unaware of the comments and all the remaining jurors denied that T.L.'s comments impacted their decision.

**{¶59}** The trial court found that Smothers was not prejudiced by the juror misconduct as all 12 jurors testified that T.L.'s alleged experiment with an infrared camera at home did not influence their decisions.

**{¶60}** This appeal followed.

## II. Analysis

### A. The Trial Court did not Err by Denying the Motion to Suppress

**{¶61}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 2003-Ohio-5372, ¶ 8. The trial court—the trier of fact at a suppression hearing—is in the best position to resolve questions of fact and evaluate witness credibility. *Id.* A reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support them. *Id.*

**{¶62}** We review a trial court's decision on a motion to suppress de novo. *Id.*; *State v. Calo-Jiminez*, 2023-Ohio-2562, ¶ 27 (1st Dist.). We must accept the facts as true and, without deference to the conclusion of the trial court, independently determine whether the facts satisfy the applicable legal standard. *Id.*

### The Automobile Exception

**{¶63}** The Fourth Amendment to the United States Constitution and Article I,

Section 14 of the Ohio Constitution protects individuals against unreasonable searches and seizures by the government where an individual has a reasonable expectation of privacy. *See State v. Evenson*, 2022-Ohio-1336, ¶ 31 (1st Dist.) (The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."); *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (the application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, reasonable, legitimate expectation of privacy that has been invaded by government action). An expectation of privacy exists where an individual has manifested a subjective expectation of privacy and that expectation is one that society recognizes as reasonable. *State v. Barnes*, 2017-Ohio-7284, ¶ 9 (3d Dist.); *see Smith* at 740. While the Fourth Amendment does not specifically provide that unlawful searches and seizures will result in the suppression of ill-gotten evidence, the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment. *Id.*; *see Mapp v. Ohio*, 367 U.S. 643, 649 (1961).

**{¶64}** Smothers contests the seizure of his car from Grant County, Kentucky, arguing that the affidavit that was signed by the judge failed to cite specific reasons why the police believed Smothers' car contained any evidence of the crime. This argument is meritless as the bases stated in the affidavit were that L.S. was found deceased, Sharonville police had previously been called to Smothers' residence for a domestic dispute, there were reports of "yelling and fighting" coming from the Smotherses trailer followed by "a loud bang" hours before L.S.'s body was discovered, there were drag marks and a trail of blood leading from the dumpster back to the Smotherses trailer, and Smothers left the scene in his car, which could contain evidence of L.S.'s murder.

**{¶65}** Smothers also argues that the affidavit contained a materially false statement because it stated that his car was at the Sharonville Police Department when the judge signed the warrant while his car was actually in Grant County, Kentucky. The trial court, however, determined that Smothers' car was searched pursuant to the automobile exception to the search-warrant requirement, not the search warrant.

**{¶66}** Under the automobile exception to the warrant requirement, officers may search a vehicle without obtaining a warrant when they have probable cause to believe the vehicle contains evidence of illegal activity. *State v. Jackson*, 2022-Ohio-4365, ¶ 28. Probable cause is "a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction." *State v. Turner*, 2016-Ohio-7983, ¶ 24 (2d Dist.), quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978). An automobile may be seized from private property and searched. *See State v. Parsons*, 2017-Ohio-1315, ¶ 25 (3d Dist.); *State v. Miller*, 2007-Ohio-6909, ¶ 19 (4th Dist.); *United States v. Graham,* 275 F.3d 490, 509 (6th Cir. 2001).

**{¶67}** While courts have historically held that the legality of a search conducted under the automobile exception turns on the mobility of the vehicle, *see Turner* at ¶ 22; *Parsons* at ¶26, 28; *Graham* at 509, recent holdings reflect that mobility is no longer a factor. The Sixth Circuit recently held:

> Where probable cause exists, 'officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.' *Michigan v. Thomas*, 458 U.S. 259, 261 . . . (1982) (per curiam). 'There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure.' *United States v. Johns*, 469 U.S. 478, 484 . . . (1985). '[N]or does it depend upon a reviewing court's

assessment of the likelihood . . . that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.' *Thomas*, 458 U.S. at 261. Only probable cause is required because 'the "automobile exception" has no separate exigency requirement.' *Maryland v. Dyson*, 527 U.S. 465, 466-67 . . . (1999).

*United States v. Vance*, 2021 U.S. App. LEXIS 33034, *12-13 (6th Cir. Nov. 4, 2021), quoting *California v. Acevedo*, 500 U.S. 565, 579-580 (1991); *see State v. Warnick*, 2020-Ohio-4240, ¶ 30 (2d Dist.), quoting *State v. Russell*, 2004-Ohio-1700, ¶ 34 (2d Dist.) (Generally, "[t]he immobilization of the vehicle or low probability of its being moved or evidence being destroyed does not remove the officers' justification to conduct a search pursuant to the automobile exception."); *In re L.S.*, 2016-Ohio-5582, ¶ 10 (1st Dist.) (An inventory search of a lawfully-impounded vehicle is an exception to the general prohibition against warrantless searches; constitutionally, there is no difference between seizing and holding a vehicle while waiting for a search warrant and immediately searching the vehicle, so long as probable cause exists.).

## Probable Cause Existed to Search Smothers' Car

**{¶68}** Probable cause was evident from the facts and as reflected in the affidavit for the search warrant. Further, yellowish fluid was found near the steps of the Smotherses trailer, surveillance footage from a neighbor depicted someone dragging "something heavy" from the Smotherses lot, and a trash bag was recovered from the dumpster containing L.S.'s soiled underwear and Smothers' mail. There was probable cause to believe that the car contained evidence related to L.S.'s murder, as police suspected that Smothers was the person dragging the body on the neighbor's surveillance video and he had left the scene in his car.

{¶69} The Grant County Sheriff's Office received the broadcast from Sharonville police to be on the lookout for Smothers and his car, which was potentially at his father's address. That, coupled with the NCIC warrant, involved the Grant County Sheriff's Office in a common investigation with the Sharonville police. Thus, the seizure did not run afoul of the Fourteenth Amendment because police are permitted to rely on the collective knowledge of officers in a common investigation to establish probable cause for a stop and arrest. *State v. Fisher*, 2024-Ohio-3164, ¶ 18 (1st Dist.).

{¶70} As the trial court found that the search was legal under the automobile exception and we agree, we decline to address the validity of the search warrant. Accordingly, the trial court did not err by overruling Smothers' motion to suppress. Smothers' first assignment of error is overruled.

### B. The State's Comments did not Amount to Prosecutorial Misconduct

{¶71} In determining whether prosecutorial misconduct has occurred, the test is whether (1) the prosecutor's remarks were improper, and, if so, (2) "whether they prejudicially affected the accused's substantial rights." *State v. Howard*, 2014-Ohio-655, ¶ 31 (1st Dist.), quoting *State v. Jones*, 2012-Ohio-5677, ¶ 200. The test gauges the fairness of the trial versus the culpability of the prosecutor. *State v. Godfrey*, 2025-Ohio-1575, ¶ 20 (1st Dist.); *see Jones* at ¶ 200. Prosecutorial misconduct only creates reversible error when it deprives the defendant of a fair trial. *Godfrey* at ¶ 20; *see State v. Knuff*, 2024-Ohio-902, ¶ 238, quoting *United States v. Hasting*, 461 U.S. 499, 511-512 (1983) (new trial unwarranted despite prosecutor's improper argument because of "overwhelming evidence of guilt and the inconsistency of the scanty evidence tendered by the defendants"). The remarks must be evaluated in the context of the entire trial rather than individually. *Godfrey* at ¶ 20. Under this test, defendant must

demonstrate that there is a reasonable probability that, but for the prosecutor's misconduct, the outcome of the proceedings would have been different. *See id*.

**Referring to Smothers as a Liar**

{¶72} Smothers argues that the State made inflammatory comments during cross-examination and closing arguments and shifted the burden of proof to Smothers by calling him a liar and implying that defense counsel concealed facts. As Smothers failed to object to the State's references to him as a liar, this issue is reviewed for plain error. Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise. *State v. Grubbs*, 2025-Ohio-2756, ¶ 60 (1st Dist.).

{¶73} Smothers cites to *State v. Hall*, 2019-Ohio-2985 (1st Dist.), in which this court held that prosecutors must not vouch for the credibility of the witnesses or express a personal opinion as to the guilt of the accused, and the prosecutor's references to the defendant as a "wolf" and "predator" without physical evidence prejudiced the jury against the defendant. *Id*. at ¶ 29-39. The instant case, however, is distinguishable from *Hall*.

{¶74} Although prosecutors may not state their personal beliefs regarding guilt and credibility, they may characterize a witness as a liar, or claim the witness lied, if the evidence reasonably supports that characterization. *Grubbs* at ¶ 83. The State calling Smothers a liar was supported by the evidence. Smothers admitted that he lied when he cheated on his previous wives and L.S., and when he told the police that he was going to work when he left his trailer when his true intention was to drive to his father's house in Williamstown, Kentucky. As discussed below, Smothers' conviction is supported by the remaining evidence. The characterization as a liar, therefore, did not  the outcome of the trial.

**Smothers' Newly-Raised Theory at Trial that a Stranger Killed L.S.**

{¶75} Smothers asserts he was prejudiced by the line of questioning regarding his assertion that a stranger killed L.S., and the trial court's failure to rule on Smothers' motion for a mistrial prejudiced him by shifting the burden of proof to him. Smothers objected to the State's questions concerning Smothers' assertion that a stranger killed L.S., but the trial court allowed cross-examination to proceed after cautioning the State it was "treading" a "delicate line."

{¶76} In *Knuff*, the Ohio Supreme Court found a number of the prosecutor's comments to be improper, but ultimately determined that, except for a statement that was objected to, which was sustained, the comments were harmless beyond a reasonable doubt because "the overwhelming evidence of Knuff's guilt" was such that even if the comments had not been made, it was "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty." *Knuff*, 2024-Ohio-902, at ¶ 246-247.

### *Post-Arrest Silence can be Used for Impeachment*

{¶77} The State argues that Smothers' post-arrest silence—his failure to assert the theory that a stranger killed his wife—could be used to impeach his version of the events since he testified in his own defense. The State's argument has merit. Ohio courts have consistently held that while prearrest silence may not be used as substantive evidence of guilt, it can be used to impeach a defendant's testimony at trial because it "furthers the truth-seeking process." *State v. Leach*, 2004-Ohio-2147, ¶ 33; *State v. Slusarczyk*, 2024-Ohio-4790, ¶ 30 (8th Dist.); *State v. Hodge*, 2022-Ohio-1780, ¶ 32 (2d Dist.). Here, there is no indication that the State's use of Smothers' post-arrest silence to impeach his testimony on a new defense theory prejudiced Smothers.

**The State's Closing Arguments**

{¶78} The State's remarks during closing arguments are also reviewed for

plain error as Smothers failed to object to the State's comments that (1) Smothers "fooled" the jury by testifying that he was going through L.S.'s phone "while going to the toilet," (2) Smothers had four years to "concoct a story and come up with something plausible" that someone else killed L.S., and (3) defense counsel's assertion that there was evidence that should have been tested did not explain L.S.'s blood being on the green towel and Smothers' clothing. Smothers asserts these comments were improper and improperly shifted the burden of proof to Smothers because it implied that Smothers and his counsel were not being truthful.

**{¶79}** In *State v. Truesdell*, 2024-Ohio-5376 (1st Dist.), the appellant took issue with the prosecutor's statement:

> Man, the way you hear [defense counsel] talk, I'd have to prove this pool actually existed or that he went to a specific casino. That's defense smoke and mirrors . . . That's why I want you to pay attention to the evidence. Don't pay attention to anything else that's a red herring . . . Because the defense wants you to believe [G.M.'s] own messed up timeline . . . .

*Id.* at ¶ 41. This court held that the prosecutor's statements were made in response to defense counsel's argument and were based on the evidence. *Id.*

**{¶80}** The same reasoning applies here. The prosecutor made the comments to refute Smothers' assertion that the State's evidence did not support a finding that he killed L.S., or his assertion that a stranger killed her. The prosecutor's comments that the defense was concocting a story and questioning the untested sexual-assault kit in the face of the remaining evidence were also made to refute Smothers' theory of defense. The prosecutor's comments, therefore, were based on the evidence and did not amount to prosecutorial misconduct. Further, Smothers fails to show how the

comments shifted the burden of proof to him, or that he would not have been convicted if the prosecutor had not made the comments. Additionally, the trial court instructed the jury that closing arguments are not evidence.

**{¶81}** Smothers' second assignment of error is overruled.

### C. The Autopsy Photographs

**{¶82}** Smothers asserts that the trial court abused its discretion by admitting inflammatory, gruesome, repetitive, and cumulative photographs of L.S., and that it unfairly inflamed the passions of the jury. The State counters that the photographs that were admitted illustrated the coroner's testimony about the condition of L.S.'s body and depicted the cause of death. It further argues that Smothers has not demonstrated undue prejudice.

**{¶83}** The admission or exclusion of evidence is generally committed to the sound discretion of the trial court. *State v. Miller*, 2002-Ohio-3296, ¶ 13-15 (1st Dist.). Gruesome photographs are admissible at trial if their probative value outweighs the danger that the accused will be unfairly prejudiced. *Id.*

**{¶84}** Under Evid.R. 403, a trial court must reject an otherwise admissible photograph where its probative value is substantially outweighed by the danger of unfair prejudice, and the trial court may reject an otherwise admissible photograph where its probative value is substantially outweighed by its cumulative nature. A photograph is not inadmissible merely because it is gruesome. *Knuff*, 2024-Ohio-902, at ¶ 172, quoting *State v. Kirkland*, 2020-Ohio-4079, ¶ 101, quoting *State v. Maurer*, 15 Ohio St.3d 239 (1984). ("Properly authenticated photographs, even if gruesome, are admissible in a [prosecution] if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative

value and the photographs are not repetitive or cumulative in number.").

**{¶85}** In *Knuff*, the trial court admitted 51 photographs the defense considered to be gruesome because it showed the deterioration of the victims' bodies. *Knuff* at ¶ 174. The Court disagreed because the fact of decomposition was relevant to the coroner's findings. *Id.* The Court, concluding that the photographs illustrated the medical examiner's testimony, documented her handling of the bodies, and showed the victims' numerous stab wounds, held that the fact of decomposition was relevant to the coroner's findings. *Id.* The Court determined that the photographs were not repetitive or cumulative as each were depicted twice to show the location of each wound with a close-up to show the characteristics of the wounds, and both bodies were photographed from several different angles. *Id.* at ¶ 175. The Court held that each photograph possessed unique probative value, thus, the trial court did not abuse its discretion in deciding that the admission of the photographs did not materially prejudice appellant. *Id.* at ¶ 176.

**{¶86}** Here, the State offered approximately 48 photos of L.S.'s autopsy during Dr. Looman's testimony, which was offered to support the elements of murder and gross abuse of a corpse. Like in *Knuff*, the photographs were not inadmissible simply because they were gruesome, nor were they cumulative or repetitive where multiple photographs of the same area of L.S.'s body showed different injuries to those areas. The photographs depicting postmortem injuries were introduced to show that those injuries were caused by dragging her body through the snow after she died, and that her body later froze solid due to weather conditions. Some of the photographs were introduced to show that the body had been thawed so the autopsy could be performed. Smothers' argument is meritless as each photograph was presented to corroborate Dr. Looman's testimony that L.S. suffered multiple injuries due to being beaten from head

to toe and strangled to death.

{¶87} The trial admission of the photographs, therefore, was not arbitrary, unreasonable, or unconscionable. As Smothers failed to show the trial court abused its discretion in admitting the photographs, his third assignment of error is overruled.

## D. *Sufficiency and Manifest Weight*

{¶88} Smothers argues his convictions for murder, gross abuse of a corpse, and tampering with evidence were based on insufficient evidence. While not explicitly stated in this assignment of error, Smothers also argues that his convictions should be overturned as they are contrary to the manifest weight of the evidence.

### Smothers' Convictions were Supported by Sufficient Evidence.

{¶89} A challenge to the sufficiency of the evidence tasks the reviewing court with determining whether the State satisfied its burden of production. *State v. Harper*, 2025-Ohio-2059, ¶ 12 (1st Dist.). To determine whether a conviction is supported by sufficient evidence, we "assess whether, construing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the necessary elements of a given crime to have been proved beyond a reasonable doubt." *State v. Rodriguez*, 2024-Ohio-5832, ¶ 8 (1st Dist.).

{¶90} Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. *State v. Robinson*, 2023-Ohio-2312, ¶ 19 (1st Dist.). Direct evidence exists when a witness testifies about a matter within the witness' personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish. *State v. Jones*, 2024-Ohio-1987, ¶ 24 (8th Dist.). In contrast, circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence. *Id.* Circumstantial evidence is the proof of facts

by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind. *Id.* Circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt. *Robinson* at ¶ 19.

{¶91} Smothers was convicted of murder, gross abuse of a corpse, and tampering with evidence. To prove murder, the state had to show that Smothers purposely caused L.S.'s death. R.C. 2903.02(A). To prove gross abuse of a corpse, the State had to show that Smothers treated L.S.'s corpse in a way that would outrage reasonable community sensibilities. R.C. 2927.01(B). To prove tampering with evidence, the State had to show that Smothers altered, destroyed, concealed, or removed any items related to the crime "with purpose to impair its value or availability as evidence" knowing that an investigation was in progress. R.C. 2921.12(A)(1).

{¶92} In determining who strangled L.S. to death, the evidence consisted of Smothers' blood on L.S.'s purse, Smothers having fresh scratches on his face when he was arrested, his DNA found under L.S.'s fingernails, and L.S.'s blood that was found on the pants and boots Smothers was wearing when he was arrested—which matched the boot prints in the drag marks in the snow. The jacket Smothers was wearing when he was arrested resembled the jacket worn by the figure in the neighbor's surveillance video and L.S.'s blood was found on it. Phone records indicated the neither Smothers nor L.S.'s phones had been moved from the lot overnight, which is evidence that neither of them left the trailer while L.S. was still alive and refutes Smothers' suggestion that L.S. went to be with R.P. at any point that night.

{¶93} The coroner testified that the antemortem injuries showed that L.S. died by strangulation after being beaten, and the postmortem marks and tracks in the snow leading from the Smotherses trailer lot to the dumpster showed that L.S. was dragged

to the dumpster from where the Smotherses lived. A neighbor's video captured a figure dragging what Smothers conceded was L.S.'s body between the Smotherses lot and the dumpster prior to it being discovered. Dragging a deceased person and leaving her naked, beaten, and bloodied body in a place where it is easily discoverable—by her neighbors no less—is certainly enough to outrage reasonable community sensibilities.

**{¶94}** A white trash bag matching those found in the Smothers' trailer containing the Smotherses mail and L.S.'s soiled underwear was found in the dumpster. L.S.'s cell phone was found in Smothers' car along with towels that had L.S.'s blood on them. Coupled with the other evidence, it is sufficient to show that Smothers tampered with evidence related to L.S.'s murder.

**{¶95}** The State, therefore, presented sufficient evidence to prove that Smothers was guilty of murder, gross abuse of a corpse, and tampering with evidence beyond a reasonable doubt.

### Smothers' Convictions Were Not Against the Manifest Weight of the Evidence

**{¶96}** When applying the manifest-weight standard of review, a reviewing court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *State v. Champion*, 2021-Ohio-4002, ¶ 14 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶97}** "A manifest-weight-of-the-evidence argument challenges the believability of the evidence." *State v. Strietelmeier*, 2022-Ohio-2370, ¶ 7 (1st Dist.), quoting *State v. Staley*, 2021-Ohio-3086, ¶ 10 (1st Dist.). It concerns the plaintiff's

31

burden of persuasion. *State v. Brown*, 2025-Ohio-2351, ¶ 17 (1st Dist.). The trier of fact is in the best position to judge the credibility of the witnesses; thus, we afford substantial deference to the trier of fact's credibility determinations. *Id.*

**{¶98}** A conviction may only be reversed under a manifest-weight review in exceptional cases where the evidence weighs heavily against the conviction. *Id.* A conviction is not against the manifest weight of the evidence simply because the fact finder believed the prosecution testimony. *Id.* Thus, a defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial; the trier of fact is free to believe some, all, or none of any witnesses' testimony. *State v. Ridley*, 2022-Ohio-2561, ¶ 25 (1st Dist.).

**{¶99}** The only evidence Smothers offered to refute the State's physical and testimonial evidence was his own testimony painting his version of the events. It was the jury's prerogative to believe the State's physical and testimonial evidence and disbelieve Smothers' testimony, particularly that a stranger killed L.S.

**{¶100}** Smothers' fourth assignment of error is overruled.

### E. *The Sexual-Assault Kit*

**{¶101}** Smothers argues that the trial court abused its discretion by denying his motion to dismiss the case based on *Brady* violations, including the State's failure to preserve and disclose the existence and destruction of the victim's sexual-assault kit, which could have been exculpatory evidence in the murder case.

**Due Process, the Fourteenth Amendment, and *Brady v. Maryland***

**{¶102}** The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted when the government fails to preserve materially exculpatory evidence or when it destroys evidence in bad faith that is potentially useful to the defense. *State v. Palmer*, 2023-

Ohio-1554, ¶ 9 (1st Dist.); *State v. Brown*, 2019-Ohio-1615, ¶ 10 (1st Dist.).

**{¶103}** A *Brady* violation occurs when the State fails to disclose evidence materially favorable to the accused. *State v. Bevins*, 2006-Ohio-6974, ¶ 47. Evidence suppressed by the State is material within the meaning of *Brady* only if a reasonable probability exists that the result of the trial would have been different had the evidence been disclosed to the defense. *Id.* "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* A due-process violation does not result from the State's failure to preserve evidence "of which no more could be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at ¶ 48.

### Exculpatory Evidence

**{¶104}** Evidence is materially exculpatory if it (1) "possesses 'an exculpatory value that was apparent before the evidence was destroyed'" and (2) is "'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Palmer* at ¶ 10, quoting *State v. Powell*, 2012-Ohio-2577, ¶ 74, quoting *California v. Trombetta*, 467 U.S. 479, 489, (1984). "The possibility that [evidentiary material] could have exculpated [the defendant] if preserved or tested is not enough to satisfy the standard of constitutional materiality." *Id.*, quoting *Youngblood*, 488 U.S. at 56.

**{¶105}** Materially exculpatory evidence can include evidence that has an exculpatory value solely because of its tendency to impeach the credibility of a government witness. *Id.* at ¶ 11; *see United States v. Bagley*, 473 U.S. 667, 676 (1985); *Strickler v. Greene*, 527 U.S. 263, 280-282 (1999). Generally, the defendant bears the burden to show that the evidence was materially exculpatory. *Id.* at ¶ 12; *Powell* at ¶

74; *Brown*, 2019-Ohio-1615, at ¶ 12 (1st Dist.).

**{¶106}** However, this court has previously held that the burden shifts to the to the State show the evidence was "solely inculpatory" if the defendant requests preservation of the evidence and the State subsequently fails to preserve it. *Id.*; *see Brown* at ¶ 12.

### Potentially-Useful Evidence

**{¶107}** If the missing evidence is not materially exculpatory, but "potentially useful," then a different rule applies. *Brown* at ¶ 15, quoting *Powell*, 2012-Ohio-2577, at ¶ 77. Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. *Youngblood*, 488 U.S. at 58. "The term bad faith generally implies something more than bad judgment or negligence." (Internal citations and quotations omitted.) *Powell* at ¶ 81. "It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Id.* "It also embraces actual intent to mislead or deceive another." *Id.*

**{¶108}** An appellate court reviews a trial court's decision on a motion to dismiss to determine whether the State failed to preserve materially exculpatory evidence or destroyed potentially useful evidence in bad faith de novo. *Brown*, 2019-Ohio-1615, at ¶ 9 (1st Dist.). "Bad faith" suggests actions based on more than bad judgment or negligence. S*tate v. Nicholson*, 2024-Ohio-604, ¶ 118. In *Nicholson*, the Ohio Supreme Court stated that it had "never held that bad faith can be inferred based simply on the state's failure to preserve potentially useful evidence." *Id.* at ¶ 119.

**{¶109}** Smothers argues that this court's holding in *State v. Green*, 2024-Ohio-3260 (1st Dist.), supports his proposition that the destruction of the sexual-assault kit

undermines confidence in Smothers' murder conviction and creates a reasonable probability of acquittal had it been properly disclosed. In *Green*, this court held that the disclosure of the police department's incident report, which only referenced the recorded statement of a witness, did not give sufficient notice because the summary of the recording failed to sufficiently apprise the defense that it revealed that the witness and appellant had work-related issues, which would serve to impeach the witness' testimony at trial. *Id.* at ¶ 23, 26-29. This court held that the State unlawfully withheld the recording where it is required to disclose material evidence in its possession that is favorable to the defense. *Id.* at ¶ 30-31.

{¶110} Although Smothers filed a request to preserve evidence and requested that exculpatory evidence be turned over to him, he has not shown that the results from the untested sexual-assault kit had exculpatory value that was apparent before the evidence was destroyed. Smothers' theory that the untested kit was exculpatory was a mere possibility and therefore, not enough to satisfy the standard of constitutional materiality. In other words, ascertaining whether L.S. had another sexual partner has no apparent exculpatory value, and, as Smothers knew this other alleged sexual partner by name, he could have obtained comparable evidence by other reasonably available means. Further, the testimonial evidence confirmed that the police investigated other potential suspects, but there was no evidence tying any other persons to the crime.

**The Untested Kit Would Have Been Potentially Useful, Not Exculpatory**

{¶111} Dr. Looman testified that it is common for a strangulated victim to fight with their assailant, including scratching to fend off the assailant. The only DNA found on L.S.'s body belonged to her and Smothers, and the lab results revealed that only his DNA was under her fingernails. The testimonial evidence revealed that L.S. struggled

with her assailant, and Smothers had "fresh" scratch marks on his face when he was arrested—the same day L.S.'s body was discovered. As the State argues, and as Dr. Looman testified, any information from the DNA kit would be speculative; even if DNA were found to show she had sexual relations with someone else, Smothers fails to show how that would impeach Dr. Looman's testimony.

{¶112} The destroyed sexual-assault kit fits the "potentially useful" category. Dr. Looman testified she only collected samples for the sexual-assault kit as a precaution due to the undressed state of the body and because she would not be able to collect samples once the body left the coroner's office. The autopsy revealed, however, that L.S. had not been sexually assaulted. Dr. Looman admitted that destroying the kit was a "mistake," which is akin to "bad judgment" or "negligence." Notwithstanding statutory requirements or in-house policies governing the maintenance of such kits, Dr. Looman testified that she did not know Smothers or L.S. personally, the sexual-assault kit was destroyed solely for storage reasons as the office was moving to a new location, and she acted unilaterally and did not notify the prosecutor or the police that she was destroying the kit. Smothers, therefore, failed to show the coroner destroyed the sexual-assault kit in bad faith; he provided no evidence of "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud."

{¶113} The instant case, therefore, is distinguishable from *Green*. The State did not knowingly withhold evidence in its possession that could be favorable to Smothers' defense. Whether results of the untested kit would be favorable to Smothers' defense is purely speculative. Ultimately, Smothers failed to show that his due-process rights were violated by the destruction of potentially-useful evidence.

{¶114} Smothers' fifth assignment of error is overruled.

### F. Adverse-Inference Instruction

**{¶115}** Smothers argues that the trial court erred by not giving his proposed adverse-inference jury instruction regarding the State's destruction and nontesting of the sexual-assault kit. A trial court must give the defendant's requested instructions to the jury if they are correct, pertinent statements of law and are appropriate under the facts of the case. *State v. Houston*, 2020-Ohio-5421, ¶ 34 (1st Dist.). Such an instruction is provided where there is a showing of the other party's malfeasance or gross neglect. *State v. O.E.P.-T.*, 2023-Ohio-2035, ¶ 90 (10th Dist.); *see* Crim.R. 30(A).

**{¶116}** We review a trial court's decision granting or denying a defendant's proposed jury instruction for an abuse of discretion. *Id.* A reviewing court will not reverse a criminal conviction due to jury instructions unless the defendant was prejudiced. *State v. Standifer*, 2012-Ohio-3132, ¶ 53 (12th Dist.).

**{¶117}** Smothers asserted that the destruction of the sexual-assault kit during the pendency of the case was gross negligence and requested that the trial court instruct the jury pursuant to Crim.R. 30(A). Smothers asserted that the destruction of the kit was intentional, and an adverse instruction could permit the jury to draw an inference unfavorable to the State, which had control of the evidence.

**{¶118}** While addressing Smothers' proposed jury instruction at sidebar, the trial court raised the fact that Smothers' first two teams of attorneys sought the strangulation kit—but not the sexual-assault kit—based on the initial defense theory that while Smothers "did indeed strangle" L.S., it occurred by accident while the couple was having sex. The court highlighted that, pursuant to that theory, Smothers sought expert testimony based on the strangulation kit and asserted that he was entitled to a not-guilty verdict based on his initial defense theory. The court pointed to the fact that

Smothers, however, did not seek a sexual-assault kit, which was available at the time he requested the strangulation kit. As the court reiterated, "at no time was the rape kit zeroed in" between 2018 and 2020 as the trial was pending. The court noted that the defense theory changed with the change of counsel, and it "realized [that] theories change," but it could not find malfeasance or gross neglect regarding the destruction of the sexual-assault kit.[4]

{¶119} Here, the State provided a satisfactory explanation for the destruction of the kit—it was due to the need for storage space where there was no allegation of sexual assault. There is no dispute that R.C. 2933.82 requires evidence in criminal cases to be stored until either the case is resolved or 30 years following a conviction, and the coroner's policy that the evidence remains stored in case a defendant is granted a new trial. The trial court finding, however, that there was no malfeasance or gross neglect was supported by Dr. Looman's testimony that the decision was a mistake and was based on storage purposes versus some malicious intent to affect Smothers' defense. Even if the trial court erred by rejecting Smothers' proposed jury instruction, Smothers fails to show how the results of a test of the sexual-assault kit would have changed the outcome of the trial. Smothers' sixth assignment of error is overruled.

### G. Juror Misconduct

{¶120} Smothers argues that the trial court abused its discretion by overruling his motion for a new trial based on juror misconduct. He asserts that he demonstrated that he was presumptively prejudiced by juror misconduct that occurred during deliberations and, therefore, was entitled to a new trial.

---

[4] Of note, the court also denied the State's request for a flight instruction regarding Smothers traveling to his father's home.

**{¶121}** When reviewing a motion for a new trial based on juror misconduct, an appellate court must conduct a two-tier analysis: (1) determine whether there was juror misconduct and (2) if juror misconduct is found, determine whether it materially affected the defendant's substantial rights. *State v. McGail*, 2021-Ohio-231, ¶ 27 (2d Dist.). The burden is on the party alleging juror misconduct to establish prejudice. *State v. Adams*, 2004-Ohio-5845, ¶ 42. The *Adams* Court stated, "We have repeatedly rejected [the proposition that *all* juror misconduct is rebuttably presumed to be prejudicial] and have held that a reviewing court will not reverse a judgment based on juror misconduct unless the complaining party demonstrates prejudice." *Id.* at ¶ 195.

**{¶122}** A trial court may rely on a juror's testimony in determining whether juror misconduct affected their impartiality. *State v. Dukes*, 2019-Ohio-2893, ¶ 19 (9th Dist.). A trial court is entitled to believe or disbelieve all or part of the jurors' statements in determining whether there was juror misconduct. *Id.*

**{¶123}** Here, the misconduct regarded a juror's statement to other jurors that she saw that the colors of objects were inverse on her own surveillance camera. Each juror—except for the three jurors who testified that they were unaware of any experiment—testified that his or her findings were not based on that statement. Some testified that the issue of the infrared camera's effect on colors was discussed and resolved before the juror made the comment. The trial court was entitled to believe the jurors' testimonies. It based its decision to overrule Smothers' motion for a new trial on each juror's testimony. Smothers, therefore, failed to meet his burden to show the alleged misconduct was prejudicial.

**{¶124}** Smothers' seventh assignment of error is overruled.

### III. Conclusion

**{¶125}** We affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, P.J.,** and **NESTOR, J.,** concur.